Good morning and may it please the court. Time doesn't permit me to cover all the issues that are dealt with in this appeal, so I'd like to deal with a couple of infringement issues and the validity issue and leave the rest for our briefs. I'd like to deal first with the 213 patent and there are two issues. One deals with decoupling claims and then one deals with claim 7, which I will deal with immediately thereafter. The decoupling claims call for decoupling or independently controlling the magnitude and frequency components of the tactile vibration sensations. The specification actually defines tactile sensations and its definition is highly relevant to our position. It says, the feeling perceived by a user when they're sensing body part experiences vibrations induced by a vibrotactile unit. Based on the undisputed evidence in this case, the underlying vibrations in the Sony Playstation do not, under that testimony, the Playstation does not infringe the decoupling claims. Do the underlying vibrations which are coupled, is it clear that the desired tactile sensation that the user feels includes the feeling of the underlying vibrations that are coupled? Yes, Your Honor, because the expert witness of immersion said that the user feels the Playstation vibrations and if you look... And that includes the underlying vibrations Yes, that's exactly right. And I would cite you to several pages, 10961 and 2, 10958 and 59. It says at those places that the vibrations are within the hertz range, 10 to 60, that a human would feel. That witness said that those vibrations are not decoupled. They are not decoupled. And that was the immersion's witness? That was the immersion expert witness. And is there any contradictory of any testimony on the other side? No, that is the testimony on the other side. Okay, can I ask you a question about this one issue? I'm sorry to rush you, but I know we're limited in time. You propose, as I understand it, a de novo standard of review. Even though you acknowledge that there's no dispute over the claim construction, in your gray brief what you say is, this is a legal argument that rests on proper claim construction, even though you're not challenging the claim construction. And I don't think you cited any cases for this notion. I wonder if you have any. Your Honor, the answer to that is, and let me clarify our position. Our position is that we're not challenging the claim construction of tactile sensations. But given the gloss that immersion is placing on it, immersion is saying, you don't look at the underlying vibrations. You look at the dominant vibrations. In fact, Mr. Chu is, I assume, going to use that chart, in which he says, let's look at the series of impulses. Let's ignore these underlying vibrations. That is a claim construction issue. The question is, under the proper claim construction, is it proper to ignore the underlying vibrations? To that extent, it is a de novo  But shouldn't one of the parties have called this matter to the attention of the trial court at the initial stage of the markment? I mean, isn't this, therefore, because in your view of the world, it is really a matter of claim construction. Why this issue wasn't resolved in the context of the markment? Your Honor, it was not resolved. There's another issue which is not resolved, and that is the rotating issue. The court declined to interpret it. The answer is, this particular matter was not interpreted by the district court, other than to say that the court agreed with immersion in terms that it looks to the dominant vibrations, and in fact, there's no discussion of decoupling at all in the court's 50B decision. The answer is that this was presented, it was debated by the parties, and for whatever reason, there is no resolution of this question. And to that extent, it's a de novo question of law, and that's all we meant in our brief. Can I ask you about the damages, the verdict of $82 million? Yes. When the district court, at the end of the day, calculates it to be a 1.37% or whatever the jury, or was the district court just trying to figure out in hindsight how they could have come up with that number? The latter. The district court took the $82 million, it took the total volume of sales of what it felt were the infringing items, and it came up with a royalty of 1.3 cents, 1.370%. That's how it did it. And sorry to jump around, but I just want to get all, there are lots of issues. That's your approach. One of the things you say in your brief is if we were to reverse on claim 213, but affirm on 333, we would still, you were advocating that we would still have to send it back for a new trial. Yes. I just want to be clear. If there were indeed, hypothetically, a new trial, would the only issues to be resolved then have to be a recalculation of damages based on the different dates of the patents? Or what other issues would be, I mean, you're not asking that the jury then would have to then go back and revisit the issues underlying. No, we're not. We're basically, aside from the ISLLC issue, which is a separate issue, in which case we would suggest if the court reversed what the district court did, there should be an entire new trial on that if they suddenly came into the case. But aside from that, we're only asking for a new trial on damages, and we also ask the court to deal with the injunction issue. Namely, we think the court applied a pre-ebay standard, and if the court affirms the liability issue, it should ask the district court to reevaluate the injunction in light of the Supreme Court's ebay decision. I thought in your briefs, I didn't see, and maybe I missed it, that you were advocating a revisiting of the injunction because of ebay. I thought you were just suggesting that maybe it's right, maybe it's not. We did two things, Your Honor. In the briefs, we said we think the injunction only enjoins systems and not components, and we asked the court to clarify that because the district court used some language, and immersion is suggesting in support of that language that the injunction should apply against components and not against the system. In a Rule 28J statement, which we filed to the court, we basically said the language that the court used in entering the injunction was that the general rule is that injunction shall issue. That's a pre-ebay statement, and all we asked the court to do was, if there is a remand and it's appropriate to look at the injunction, to just instruct the court to revisit it. We're not asking this court to revisit it. We're asking the district court to revisit it in the first instance. But on the second point, leaving aside the ebay question now, would it be a matter that's right for us, given that, I mean, at best, there might be, and you suggest there's some ambiguity in what the injunction says, and wouldn't that have to really await the application of the injunction to contempt proceedings for us to really be able to evaluate it? Your Honor, we pointed out in our gray brief that there's a problem doing that, and the problem is that the standard for review of a contempt order has to be that the problem has to be perfectly clear. And we said we're concerned we can't meet that standard, and therefore it is right, given the standard of review that would take place in a contempt proceeding, now is the time to do it. We spelled it out in our gray brief. Now, I'm happy to answer any questions you have. No, go ahead. Going back to the issue on decoupling, we say that given the uncontroverted testimony of Immersion's own witnesses, and given the definition of tactile sensations, that the underlying vibrations must be considered. It's clear they are not decoupled, and therefore we don't satisfy this claim language. Now, what is Immersion's position? Immersion says you need to look at the series of impulses. You really don't look at the underlying vibrations, even though they are indisputably there. We say that's not supported by the claim language, and we say it's not supported by the specification. And the perfect answer to that is, if you look at 333, which is the second patent, claim 1, what you see is, in that claim, they actually use language which Immersion is trying to import into these claims. It said, rotating vector force creating a tactile sensation upon said user that is perceived by said user as one of vibration, an impulse, and a series of impulses. Three different things, three separate things. They're arguing that you should only look at the series of impulses. There is no question that the individual vibrations shown within each of those loops are not decoupled in the Sony system, and that they are sensed, they are perceived by a user. We say that alone is enough. Now, also, if you look at the 213 patent, and you look at the only detailed discussion in that patent, which is in column 15 and column 16, you see they describe three separate decoupling procedures. And in column 15, lines 23 to 25, they say, figures 25A, B, and C, illustrate an approach for decoupling the amplitude and frequency components of the vibrations generated by an eccentric mass-based vibrotactile unit. And they say the same thing at the end of that same long paragraph in column 16. They say nothing about ignoring underlying vibrations. In fact, even the quote that Mr. Chu is going to point you to in column 2, for a small number of rapid rotations, the rotating force vector feels like a single impulse. There's nothing tying that to the decoupling procedure. That's a statement right in the early part of the patent. There's another statement in column 4, the sense that it's changed independently of the amplitude by modulating the power to the vibrotactile unit at a variable frequency. That's totally consistent with considering underlying vibrations. It's totally consistent with considering, what they argue, a series of vibrations. It doesn't really prove a thing. So, the basic bottom line is that the claim language itself really governs here. It says, the control over the magnitude and frequency components of syntactical vibration sensations are decoupled. That is defined as a user perceiving them, and we say under those circumstances, we cannot express. Let me ask you one quick question about claim 7. Immersion says, as I understand it, that nothing in the claim language requires that each actuator create a vibration with varying frequency and amplification. Is that correct? The only thing that's correct is that that's what they say. I disagree with their position. Because? For two reasons, and let me start with the second reason. If you look at the origin of claim 7, the clearest prosecution history establishes that we, I submit, are right. The prosecution history shows that patent claim 7 evolved from application claim 10 and application claim 1, which ultimately were combined, and in combining them, the applicant said, I am adopting all the limitations of claim 1. Claim 1 is significant because claim 1 said, it called for an apparatus providing a tactile sensation wherein each unit comprises, each unit comprises, and then it said a mass-moving actuator for transmitting vibrations and so on and so forth. It used the same language which is in patent claim 7, but it said it was for each unit. When they adopted, merged claim 1 into claim 10 and said, we're adopting all the limitations of claim 1, they were basically saying, each unit has these limitations. And in fact, if you look at the language of claim 7, the very last two words are said vibration, and the only antecedent for that is vibrations up in the upper part of the claim. And each one of those limitations talk about each of said actuators transmitting vibrations, and each of said actuators coupled to said vibration, it takes it back to that early clause. It establishes, I submit, irresistibly, that in fact, you've got to have each unit performing the function, you can't merge the two. And in fact, if you look at, if you look at one of the claims, you'll see claim 14 of the 333 patent, you will actually see they use the word vibration, combination in that case, suggesting that in fact, they knew how to use the word combination when they wanted to use that word. I see that I'm eating into my rebuttal time. We'll save your rebuttal time. Do you have any more questions? Okay, thank you. Mr. Lindley? Your Honor, we're doing a quick switch here. May it please the Court, Mark Lindley on behalf of Cross Appellant, ISLLC. ISLLC is the exclusive licensee to the 213 and 333 patents in the field of age-restricted video games. Despite this fact, Immersion sued Sony for infringement of these patents in all fields, including age-restricted video games, without joining or even notifying us. We weren't brought into the case until after the jury verdict, when Sony implicated us as a necessary party. Can I just ask you about sort of the procedural posture of all of this? Yes. In the red brief, I think Immersion says that under the Statement of Related Cases, that there's a case pending, if I'm correct, in the State Court of California, which doesn't seem to, which you don't include. And my further question about that is whether there is or there isn't, and I'd like an answer to that, whether or not you think that given the Court's dismissal without prejudice for your claims of breach of contract, I think, and unjust enrichment, if you're precluded from going to state court, if you're not already there. So, Your Honor, the state court action was a result of the Court's dismissal without prejudice. She said we could refile contract claims if we could, alleging specifically claims related to the compulsory license of games, as a separate breach of contract action. We had an internal discussion about that, decided that there was no federal subject matter jurisdiction over those pure breach of contract claims, so instead of refiling it in federal court, we filed it in state court. Immersion has removed, and the judge concluded that there was subject matter jurisdiction over those breach of contract claims alone. So it's pending in federal court in front of Judge Wilkin. It's currently stayed pending the resolution of this appeal. But if you were to pursue this in state court, is it your view that you're sort of prejudiced by some of the conclusions reached by the district court judge in this case with regard to the interpretation of the license? Absolutely, Your Honor, because we believe that we are, in fact, an exclusive licensee of these patents who should have had co-plaintiffs' standing and a right to a share in the judgment as to age-restricted games. What Judge Wilkin actually said we could plead was something much narrower, which is a claim only on the going-forward compulsory license to games alone. But you're not contending, because there's a dispute back and forth in the briefs between you all and Immersion, that you're the exclusive licensee of the entire patent. No. I mean, there's no, because as you point out, Immersion suggests that in its brief that that's your position. So I just want to be clear that that's not your position. It's absolutely not our position. Our position is that we are the exclusive licensee only as to a subset of the games that were at issue in this case, the age-restricted games. And as to those games, we think it's quite clear under this Court's test, the correct test, which the district court did not apply, that we have some substantial rights in the patents, that is, rights in a particular field of use, and that under those rights we're entitled to co-plaintiffs' standing and therefore to a share in the judgment. Now, with regard to the cases that you cite, it seems to me those cases deal with when the exclusive licensee tries to bring a case on its own. And in those cases, our Court says you could bring a case as a co-plaintiff. Am I right about that? Correct. For the most part. And my problem is, does that necessarily mean that they have a right to join as a co-plaintiff in an action brought by the patentee? Because that seems to me to be a sort of step missing in the cases you cite. Your Honor, I think the answer is yes, for two reasons. There are two cases that I think make that clear. One is intellectual property development versus TCI Cablevision, which is cited in our briefs, which says, quote, an exclusive licensee having fewer than all substantial patent rights possesses standing under the Patent Act as long as it sues in the name of and jointly with the patent owner, which is what we contend would happen here. The second is this Court's more recent decision this year in the Aspects versus Miracle case, where the Court quite specifically said that, quote, there must be joinder of any exclusive licensee, unquote. So the question there was not the normal situation where the exclusive licensee sues without joining the patentee, but the reverse situation, our situation. Patentee sues without joining the exclusive licensee. And in Aspects, the Court specifically says you have to have joinder of an exclusive licensee who has any substantial rights in the patent. Though in the Mentor case, this Court then went on to say that under Federal Rule of Civil Procedure 21, joinder could happen at any stage of the action and on such terms as are just, which is effectively what we're asking for here. So you say it's been removed. Is it now before Judge Wilkins? Yes, it is. And it has been stayed. And assuming that we get the relief that we think we're entitled to before this Court, we think that action will simply merge back into the original one we had originally sued for breach of contract. We filed this kind of remaining action because that's what Judge Wilkins instructed us to do with the without prejudice portion of the dismissal. Okay. So that's related. On page 11 of your gray brief, you ask for reversal of the dismissal of claims even if there's no standing. As I understand it. That's correct. And does that mean that because then you think you could reinstitute them in Federal Court? Whether in Federal Court or in State Court, this is a procedural morass, Your Honor. It's our belief that if the only cause of action we had were a breach of contract claim against immersion, that that cause of action doesn't in fact confer Federal subject matter jurisdiction because it doesn't depend on the resolution of a patent law issue. That's why we filed in State Court. Judge Wilkins disagreed. Immersion removed. Judge Wilkins said, I think it does depend on a resolution of an issue of Federal law, whether you're an exclusive licensee. And so she concluded that there was Federal subject matter jurisdiction. My fear is that if we go back just on a breach of contract claim and litigate it, then at some point, perhaps on appeal, this Court will conclude there is no Federal subject matter jurisdiction and we should have been in State Court all along. But I think we can avoid all of that if we apply the correct legal standard and conclude that we are entitled to co-plaintiff standing. And in that circumstance, I think what happens on remand or after this Court's opinion depends on what this Court does with the Sony appeal. If immersion wins the basis of the Sony appeal, my client is willing to accept the verdict. We're not going to demand a new trial or to go back for more, provided that we're entitled to share in the judgment that immersion received as a co-plaintiff. If this Court is otherwise inclined to reverse and remand anyway, then we think we ought to participate in that retrial as a co-plaintiff. Mr. Landley, immersion takes a position, I believe, that you don't have any apparatus rights, that yours is just a software right, and therefore you don't have an interest in either of these patents. Would you respond to that? Certainly, Your Honor. That's wrong, I think, for four reasons. First has to do with the nature of the technology. We're talking about haptic technology, which means things that make your video game controllers vibrate. That technology, by its nature, requires an interaction of software and hardware. There is no way to have haptic technology that is software that doesn't interact with or has to actually move something physically in order for it to work. So to say we had no rights in systems that used software to enable haptics would mean that the license agreement was meaningless, that we paid a million dollars at this point for nothing. Second, immersion has itself previously acknowledged in letters to ISLLC that the 213 and the 333 patents were covered within the scope of the software license agreement. We asked immersion, what patents can we go forth and enforce in our area of exclusivity, and they sent us a list of patents that included the 213 and the 333. This was not part of the record. That's correct, Your Honor. That letter is not part of the record because of the procedural posture on which this case arises. This case is governed by notice pleading. We pled that we had exclusive rights in the 213 and the 333. We didn't plead every piece of evidence in support of that conclusion, though we think this evidence is certainly supportive of that conclusion. We think this court can take judicial notice of it. It's in the appendix of record and was included there without objection by immersion. Alternatively, we think at a bare minimum, we should have been allowed to re-plead, to amend our claim, to plead the evidence that quite clearly establishes that even in 2003, while this suit was going on, immersion was representing to us that we had exclusive rights in the 213 and the 333 patent. Third answer, Your Honor, is judicial estoppel. Immersion submitted a jury verdict form, got a damage award, and is receiving ongoing royalties based on the sale of age-restricted video games standing alone, not just the sale of all components together, but of each individual piece alone. It also got an injunction against the sale of age-restricted video games standing alone. Having made its money, having gotten its rights by representing to the court that that pure software, those video games, were infringing the 213 and the 333 patents, immersion should not now be heard to turn around and say they're not software, games alone are not part of the patents, and therefore the rights aren't here. And in the jury verdict form where there's the listing of all these games, some of those games are the software that your client is part of the exclusive license. Exactly right, Your Honor. So in conclusion, Your Honor, I think we had some substantial rights to the 213 and the 333 patents. There's a system that involves software. We didn't have all substantial rights, but the district court was wrong to think that we needed all substantial rights in a circumstance in which immersion, the patentee was already part of the suit. We think we belong in the suit as a necessary party. We think we're entitled to a share of the judgment, and that's what we ask for. But just on that point, and I think you covered it before, you don't want— my understanding is, assuming the case is affirmed, the underlying infringement, you want standing solely for damages. You don't also want to assert that you should have been able to present other infringement claims. That's correct. We will accept the jury's verdict and the district court's award as long as we get to share in the remedies, share in the damages that immersion got. I think also share in the right to enjoin to the injunction, assuming the injunction is affirmed. But we don't demand a retrial. We're not asking that this court go back if it's otherwise inclined to affirm and reopen anything. So the only thing that would be required on remand is, I think, a relatively straightforward calculation of which video games were age-restricted and how much in damages are attributable to those based on their sales numbers. Why is it that you did not want to be joined? Your Honor, we were not informed of the suit by immersion until ever. We found out about the suit from public sources very late in the game. In April of 2004, a couple months before trial, we told Sony—we sent a letter to Sony saying, hey, we don't know if the age-restricted games are at issue in this suit or not, but we just want to let you know we do have rights in these patents. Sony then moved to bring us in. And that motion took place a couple of weeks before the jury trial. We sent a letter to the court saying, Your Honor, we think it's too late for us to effectively participate in that jury trial. We think the best thing for you to do is just carve the age-restricted games out of the trial and go ahead with the trial and the rest of the games. The district court decided not to do that. She held a trial on the whole thing. That, I think, was not the ideal outcome from a procedural perspective at the time, but given that it's happened and given the procedural posture that we're in, we're willing to sort of accept the jury verdict, which was mostly favorable to immersion, though not completely, and in the interest of judicial economy. Okay. Thank you. I'll reserve the remainder of my time for rebuttal. Thank you, Your Honor. Okay. May it please the Court. Mr. Chu. Good morning. Morgan Chu on behalf of plaintiff Annapolis Immersion. Let me first address Sony's argument with respect to the 213 patents decoupling claims. First, I want to describe what Sony's argument is, because there is a huge part of it with which we not only agree, but we must agree, and that is the following. They are saying, in essence, that at least under some circumstances, a user can feel some underlying vibrations. We agree with that, but let me explain the physics of it. What is involved in both patents are eccentric rotating mass actuators. They are inexpensive motors. They've been in the prior art a long time. They have a shaft. They have a mass attached to the end of the shaft, and it's eccentric. It's all centered. So if I use my arm to simulate that, here is the motor with a low frequency. It's making a low number of rotations per unit of time, and it causes a wobble. It causes a vibration much the same way that a simple buzzer does or a simple pager, which uses these kinds of motors, create a simple buzz vibration. Okay. Now, how do I get a bigger magnitude, a larger magnitude, a bigger vibration or amplitude? I speed up the frequency, and the more I speed it up, the more vibration there is, and then if I slow it down, the magnitude decreases. Increase the frequency, you increase the magnitude. Decrease the frequency, you decrease the magnitude. Those are the laws of physics. That's existed forever since these motors were first invented. Now, what's the invention? The invention is to take these inexpensive rotating mass actuator motors and say maybe we can get some textured sensations from these inexpensive devices, and one way to do that is to decouple from the point of view of the user magnitude from frequency. So here's an example. This is in evidence. Before the court below, before the court here. There's a Sony game called Legend of Doom. It involves galloping horses, and there are riders on the horses. So when the horses are near the user, they're near the user on the screen, they're near the user on the sound, and they're near the user in terms of the sensation the user is feeling, you hear clippity-clop, clippity-clop, clippity-clop. The horses are galloping. You feel the magnitude of the vibration at a high level. As the horses gallop into the distance, here's what you hear. Clippity-clop, clippity-clop, clippity-clop, clippity-clop, clippity-clop, clippity-clop. So you notice the magnitude is going down, but notice the frequency is the same. The space between each clippity and clop, each clippity and clop, is the same. It's clippity-clop, clippity-clop, clippity-clop, clippity-clop, clippity-clop. And that's the magic of the invention. It is to the sensation of the user decoupled. Does the user feel it? You betcha. This graph illustrates it. This is a graph used at trial. Professor Colgate of Northwestern University, who specializes in this area of haptics, the science of sensations, says, well, here you can never decouple the underlying vibrations. That's just the physics. So if you look at the first envelope, where it's pointing to actual frequency, you'll see that that frequency has a certain magnitude. But what the user feels is that first sensation, and then the second sensation, and you notice as we go left to right, the magnitude of what's being felt by the user goes down. Now let me relate it to the claims, keeping in mind that we agree. And Dr. Colgate said, yes, if the user attends to the feeling, thinks about it, focuses on it, then yes, under certain circumstances, he or she may feel some of the underlying vibrations. Let's look at the claims. The claims refer to correlating events in the computer simulation, the game. So there's the galloping horses in the game, that's what you see on the screen, and you correlate these events, quote, with a desired tactile sensation, end quote, that is decoupled. Correlating events with, quote, a desired tactile sensation, end quote, which is decoupled. So in Legend of Doom, that's what the user is feeling. The user is seeing the events of the horses galloping into the distance, and he or she, the user, is feeling the magnitude decrease as the frequency of the clippity-clop remains the same. Now, let's suppose we have a thousand users, and we ask for a thousand users, and want you to focus on it. Might you feel a little underlying vibration there? And let's say half, or two-thirds. Say, yeah, I can feel a little bit. It's irrelevant, because we have to look to the claim. It's correlating events to a desired tactile sensation, and that's decoupled. Let me ask you, and maybe I'm missing. Why is it irrelevant? Is it irrelevant because that doesn't come within the word desired, that this is extraneous, and therefore not desirable, so we just ignore it when we're deciding what desired tactile sensation means? That's part of it, but there are two separate reasons. One, we look to the actual claim language. Is anyone correlating the events of these underlying vibrations with anything? No. No one's correlating the events. So the claim tells us, correlate the events with the desired tactile sensation, in my example of Legend of Doom, the clippity-clop. So we know we have to ask ourselves, with the clippity-clop, is the user getting a desired tactile sensation that is decoupled? And here's the evidence at trial. Dr. Salisbury, Sony's expert, says no. He has lots of explanations. There's a lot of evidence in that. Dr. Colgate, Professor Colgate from Northwestern University says, that's not the case. This is my area of science and engineering. And I did tests. I took accelerometers. It's a device where he hooks it up to the controller. He measures the vibrations. There are a couple charts that are in the briefs. In the record before this court, there were scores of those tests that show that this decoupling is in fact taking place. That's the first reason. You look to the claim language, and we meet the claim language head-on. Here's the second reason. Let's suppose video games, they always have 10, 15, or 100 different scenes in the video games. Let's say 99 out of 100 scenes, every vibration was coupled. Let's say even in the last scene, 90% of the vibrations were coupled. Might that last scene still infringe as long as the user gets desired tactile sensations from the user's point of view that are decoupled? And the answer is yes. Now, let me go on to the second argument by Semmy this morning. And that was on claim 7. So let's start with the basics of the claim. It requires a plurality of motors. Two or more. And then the claim addresses having a, quote, a tactile sensation that will operate on, quote, a sensing body part. That's in the very beginning of the preamble. So a generally means one or more. So to simplify it, two or more motors can generate one complex tactile sensation and if it meets the other limitations, it infringes. In the body of the claim, it leaves no doubt, in the second or third to last line, what is being produced is, quote, a complex tactile sensation. Again, the word a. So it can be just one complex tactile sensation. And the patent even discusses you can have two motors, two different locations, and they produce only one sensation in one location that is different from those two motors. It might be somewhere right in between those two motors. The patent discusses that. Now, what Judge Wilkin was addressing is exactly the following question. Sony is arguing that you've got to vary the frequency of each of the motors of the plurality of the motors, two, three, four, whatever the number is. You've got to vary them all. And if you don't vary all of them, I'll use a simple case of two, one is held constant and the other is varied, then you don't infringe. That's Sony's argument. That's a claim construction argument. And the court says, well, wait a minute. Let's look at the language of the claim. Let's look at all the claims and the specification. We have single motor claims. And in those claims we see the motor is varying the frequency. Okay. But what happens when you have the two motor or the plurality claim as in claim seven? She says, wait a minute. If you get that complex tactile sensation from her reading and parsing of the claim language along with the specification, as long as you're varying the frequency of one of the two motors and producing what is considered to be a complex tactile sensation that infringes. So, if you examine carefully the district court's discussion, it provides the overall context. Now, there's another argument mentioned by Sony this morning and mentioned in its brief and it has to do with the prosecution history. There was, I'll call it application claim 10. And indeed, let me cite to the exact page number where you could see it in the record. It's page A1099. Claim one in the application is a one unit claim. And it says, here's one unit. You vary the frequency of that one unit. Dependent claim nine says it's a plurality. And then 10 depends on nine. And then here's what 10 had. We're in an apparatus according to nine, which depends on one. Said signal processor produces multiple activating signals for individually activating each vibrotactile unit of said plurality of vibrotactile units to produce a complex tactile sensation. The emphasis is individually activating each vibrotactile unit. It says nothing that every vibrotactile unit has to vary the frequency. The emphasis is on individually activating. And in fact, the applicant says to the PTO, all the limitations of claim one. Claim one, of course, is one unit, only requires one unit to have varying frequency. All the limitations of claim one, I'm going to include when I rewrite claim 10 in the application to be a new independent claim, which turns out to be seven. The applicant doesn't say anything beyond that. So what are the limitations in claim one? One unit and varying the frequency.  at least one unit with varying the frequency. Nowhere else in the claim, nowhere else in the specification is a requirement otherwise. Now, here's the key. In the specification itself, in column three, starting at line 52, and I'm using the line numbers from the 213 patent, there's about a three-line difference between the two patents. It goes on to describe examples of complex tactile sensations, and here's one of the preferred embodiments, example five, which is at line 59, column three. Quote, vibrating two or more vibrotactile units with a uniform or non-uniform amplitude profile, end quote. So the two or more, that's claim seven. That's the plurality claim. And it says, quote, with a uniform or non-uniform amplitude profile. Well, uniform means you're not varying the frequency, because in order to have a uniform amplitude profile, as I explained at the outset because of the physics, you hold the frequency constant. So it's the same as saying you're holding the frequency to a uniform frequency. So not only does claim seven itself, looking at the language, contemplate that, but the specification in describing one of its preferred embodiments contemplates that. I wanted to say one last thing about the injunction issue, and that's the following. I wanted to call the court's attention to a case. I could see why the court might logically or practically say, let's just send it back to Judge Wilkin. She's a fine district judge, and she'll look at eBay. There's a case that's not directly on point, but I do want to call it to your attention. It's Abbott Labs versus Cintron with an S, and it's 334 F3rd 1343, and the holding is at about 1355. It's a decision of this court. It involved a case on appeal, and meanwhile Festo was in the process of being decided. Cert was granted before the opening brief. Nothing was said in the opening brief. The Supreme Court decides Festo. In the reply brief, the appellant raises its hand and says, boy, I want the advantage of Festo for my case, and the federal circuit in this decision says, no, you don't get that. You're too late. You should have raised it earlier. Now there is a factual difference here, which is the cert petition was applied for, then the opening brief by Sony was filed, and within about a month the cert is granted, and then later the reply brief is filed, but it is long after the grant of the cert petition, and part of the thinking in that case was, well, in certain circumstances you may lose the rights, just to illustrate the point. KSR versus Telfax is being decided by the United States Supreme Court. When in the appellate process can appellants raise their hand, not having raised their glove, and there's a limitation to that, it's a practical issue that needs to be sorted out. Wait. So your position is arguably that because the eBay question was pending while this case was before the district court, then the appellants were required to have raised that with the district judge in order to preserve it? Is that what you're saying? I would say it differently. The case I cited, the Abbott Laboratories case, doesn't decide precisely the question that is before this court. As a practical matter, I could see fashioning a rule that would say if you didn't raise it below or you didn't raise it in the opening brief, no matter what the timing, you can't suddenly raise it. I could see a different rule applying, and we can think through all of the practical difficulties when things are being raised. But here, it could have been raised by the time of the reply brief. It could have been raised earlier because the cert petition was applied for. The cert petition had been granted by the time of the reply brief, and it wasn't raised. Let me ask you, the second part of the injunction argument is not just eBay, but it's on whether or not what the proper scope of the injunction is. Is it your view that that issue, that question, is appropriate here and right for review? I don't think there's any need to. The earlier discussion had to do with the contempt proceeding. I think it would end up being an advisory opinion without knowing what the contempt proceeding is about, what the allegedly infringing device is. We would be just rewriting in thin air. The point is that any document, including an injunction order, could always be made more specific by adding another 25 or 50 pages. I don't know that that helps. Is this also the time to be asking you questions about the ISLC? You didn't cover it, and that's fine. But what is your position with regard to the cases that have been cited by Mr. Lemley? Don't those cases indeed establish under the precedent in our court that they had the ability or the right to be joined as a co-plaintiff, to come in as a co-plaintiff? Actually, all of the case law is directly contrary to the ISLLC position. And here's the point that's missed by the ISLLC argument. If they have any exclusive rights that relate to patents, it's not these patents, because the agreements between Immersion and ISLLC say, software only, and then you have a non-exclusive right to hardware. All of the claims, the asserted claims and all the claims in these patents, have hardware elements. So they couldn't conceivably say they have an exclusive right to enforce these particular patents, unless, as an example, someone with non-exclusive rights could wear that set of clothing. But the damages, it is correct, is it not, that the damages included damages based on calculations of the sale of the software of the adult video games, right? Damages included software that are put into certain categories. It's not on appeal right now, but the substance of their argument is wrong. Those aren't adult content. These are games that teenagers can play. Put that aside for the moment. The answer is yes, damages included, some software games for which they're claiming rights. But they only can claim those rights under these patents if they have exclusive rights that include hardware, and they plainly didn't because it was specifically carved out and every single one of the claims has hardware elements. That's the end of the analysis. So your position is that these issues are open, assuming that Judge Wilkin has reason to review them and that they haven't yet been resolved? She's resolved the subject matter of the precise appeal that's before this court. Mr. Lendley described the state action that was removed in federal court that's been stayed. There may be further action in connection with that case, but, of course, what that action might be, whether it should be reviewed by this court, what happens with that other action is left in the air. Because what you described sounds like contract interpretation with respect to the software-hardware issue. It could be if there was anything in dispute, but the clauses are very clear that there are no hardware rights except there is an agreement that says you have some non-exclusive rights to hardware. And ISLLC is not trying to find some newly-minted interpretation of those clauses. They're very clear on their face. Is your position that the judge's analysis of the license agreement and the content of the license agreement is that any further dispute on breach of contract, that that would be raised judicata? It depends on what the breach of contract action is. So the breach of contract action has been stayed. It hasn't progressed so that we know exactly what that action is. I can hypothetically conjure up some breach of contract actions that might survive, but many others, if it's based on the issues that are before this court, that's been disposed of, that's been addressed by Judge Wilken. And that would be right for review by us, correct? I mean, if you're saying that those... that analysis and that judgment with respect to the interpretation of the contract would be raised judicata on any further breach of contract issue, shouldn't we be reviewing it now here? I'm saying Judge Wilken's decision should most definitely be reviewed now. It might... let's say this court were to affirm. It might have some impact on breach of contract claims that ISLLC may seek to pursue in the state action. It might well have impact on those claims. It may well have a large impact. But that action is in a nascent state. So I think the court should, if it agrees with Judge Wilken's analysis, affirm and then we'll wait to see what happens with the state contract action. And what if we were to hypothetically disagree with Judge Wilken's analysis? I think it depends on the point of disagreement. In other words, well, I can think of an array of ways in which you could disagree even though ISLLC says they don't want to retry everything. They want to ride immersion's coattails for everything except the money at the very end. But I can see a variety of other hypothetical decisions. Is that helpful? Okay. Any more questions? Thank you very much, Your Honor. Thank you, Mr. Chu. Your Honors, let me just deal briefly with the Claim 7 issue, which was the last point that Mr. Chu alluded to. Conspicuously absent from Mr. Chu's discussion are the last two words of Claim 7, said vibration. That relates back to the first clause talking where each of the actuators produce vibrations. They are basically tying that last clause back to the first clause where each of the actuators produces these vibrations and each of the actuators actually produce the result. And that is made absolutely clear by the prosecution history where Claim 1 applied these same terms, these same functional terms to each actuator. And by combining that with Claim 10, they basically were saying for all of the actuators in this Claim 10, each one has that language. So much for Claim 7. Going back to the decoupling issue, I think the problem here is that Mr. Chu is describing the invention they would like to have claimed with the invention they did claim. The invention they would like to have claimed parallels Claim 1 of the 333 patent where they actually recited vibration, impulse, and a series of impulses. Contrary to what Mr. Chu said, you will not get these underlying vibrations some of the time, you will get them all the time. That's why they are called underlying vibrations. Those underlying vibrations are underlying every pulse. And the citations I gave you before for the testimony of immersion's expert witness actually spell that out, that you will feel these vibrations, particularly look at 10958. The measurements that I showed of vibration are precisely indicative of what someone would feel. What Mr. Chu is talking about is a simulated response, not the actual response. The actual response is what you get in every case and that's what a user will feel and the definition of tactical sensations covers precisely the underlying vibrations. Now as to the injunction issue, let me mention one last point, and that is Mr. Chu says you cannot change the physics. Well, that's exactly what they did in the column 15, 16 examples. They fill up the eccentric mass with a fluid to make it heavier. They expand the radius of gyration of that mass. They're changing the physics. We're not doing that. We have a stop-start system which is not at all disclosed in the decoupling examples of the patent. We're using a different system. The last point I would make deals with the injunction. Mr. Chu cited a case, the Abbott case, that was not cited before. They didn't file a response to our 28J statement. I would appreciate it if we could file a brief, one-page response to that following this hearing. Yes, you certainly may, but when you file your response, check with Mr. Chu in case he wants to argue with you, perhaps within a week or so. Let us have your position on that case. Mr. Chu and I get along very well. We will do that. Okay. That's it. Unless there are questions. Any more questions, Mr. Dennett? Thank you, Mr. Dennett. No, no problem. One more quick change, Your Honor. So, Mr. Chu referred to the hardware agreement, and I just wanted to briefly address that issue. We do, in fact, have a separate hardware agreement that gives ISLLC non-exclusive rights to hardware. That agreement specifically says, however, that it has to be read in conjunction with the software agreement, which gives us exclusive rights to software. That software agreement provides exclusive rights to ISLC for any IP, quote, covering the Immersion technology. The Immersion technology is defined as, in part, Immersion's development tools and other software used to provide haptic capabilities to websites, webpages, and any other forms of technology. Now, reading those two in conjunction with each other, I think the only way to understand the agreement is that we are entitled to exclusivity with respect to the software components of a system, but not with respect to the hardware components of a system. That doesn't mean we have no rights here. It means we don't have all the rights to these patents, but it means we have some of the rights. Indeed, under Mr. Chu's analysis, Immersion doesn't have all of the rights either and shouldn't be enforcing the 213 and the 333 patents because while he says every one of those claims includes hardware, it's equally true that every one of those claims includes software. And if they've licensed away exclusively all of their rights to software with respect to age-restricted games, they wouldn't have any rights either on the same analysis. The right understanding, I think, is that we share the rights, that we both have rights in these patents and we belong as co-claimants. And finally, I want to mention briefly the contract issue. We did specifically appeal the district court's decisions on the breach of contract and constructive trust claims because the decision she made, saying we have no rights in the 213 and 333 patents, makes it very difficult to proceed with a contract claim. She's left us a very narrow sliver of rights, but we think at minimum and regardless of what this court does with respect to co-claim of standing, we're entitled to a remand in which this court clarifies that we do in fact share rights with Immersion in the 213 and 333 patents so that we can then bring a breach of contract claim or a constructive trust claim for the profits that are rightly ours with respect to those patents. Any more questions, Mr. Member? No questions? Thank you. Thank you all. The case was well presented. It was taken under submission. If you do file a discussion of that case, do file it by the end of the week.